WISCONSIN PUBLIC SERVICE CORPORATION, a Wisconsin
Corporation, Plaintiff-Appellant,

v.

HERITAGE MUTUAL INSURANCE COMPANY, a Wisconsin
Insurance Corporation, Defendant-Respondent.†

Court of Appeals

*No. 95–2109. Submitted on briefs January 3, 1996.—Decided
March 12, 1996.*

(Also reported in 548 N.W.2d 544.)

†Petition to review granted.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *David A. Piehler* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Glenn H. Hartley* of *Schmitt, Hartley & Koppelman, S.C.* of Merrill.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Wisconsin Public Service Corporation appeals a summary judgment dismissing its complaint against Heritage Mutual Insurance Company. WPS's complaint sought recovery for cleanup costs directly from Heritage, the insurer of Helmreich Utility Construction, Inc., pursuant to § 632.24, STATS., Wisconsin's direct action statute.[1] On summary judgment, the trial court considered whether Heritage's

---

[1] Heritage does not contest WPS's claim that it was appropriate to bring this action directly against Heritage because of § 632.24, STATS., and the insurance policy, which provides: "A person or organization may sue us directly to recover damages allegedly caused by you or join us as a defendant in a suit brought against you for damages." Section 632.24 provides:

> **Direct action against insurer.** Any bond or policy of insurance covering liability to others for negligence makes the insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured.

comprehensive general liability (CGL) policy provides coverage for the expenses WPS incurred paying bills on behalf of the Tomahawk School District after the school district followed a state request to investigate and remediate contamination caused by Helmreich's negligence. The trial court concluded: (1) The policy does not provide coverage because investigation and remediation expenses do not constitute "damages" as that term is defined in CGL policies; and (2) the pollution exclusion provision excludes coverage for the damages WPS is seeking. Because we conclude there is coverage under the policy and the pollution exclusion does not apply, we reverse the judgment and remand for further proceedings.

The parties stipulated to the following facts for purposes of summary judgment:

> Sometime prior to October 4, 1990, the Tomahawk School District applied to Wisconsin Public Service for the installation of gas service to its building at 18 East Washington Street, Tomahawk, Wisconsin. Wisconsin Public Service agreed to provide this service to the building and agreed that it would install a service line from its main to the building. The actual installation of the service line was to be done by an independent contractor hired by Wisconsin Public Service, Helmreich Utility Construction, Inc. Helmreich executed an indemnity agreement in favor of Wisconsin Public Service whereby Helmreich Utility agreed to indemnify Wisconsin Public Service against all actions, claims, demands, damages, losses, costs and expenses which relate to personal or bodily injury, damage to property of any kind where the action claimed damage, loss, cost or expense in any way arising out of, in whole or in part, any act or omission of the contractor.

On October 4, 1990, Helmreich installed a service line from the gas main to the building and in the course of the installation, cut an underground pipe that carried fuel oil from an outside underground tank into the building for the oil furnace. The leak was first discovered on or about October 22, 1990, and Tomahawk School District notified Wisconsin Public Service and the Wisconsin Department of Natural Resources. The cut line was excavated and repaired by the School District but fuel oil had already leaked from the tank's cut line into the surrounding soils.

On October 22, 1990, the State of Wisconsin Department of Natural Resources mailed to Tomahawk School District a letter directing them to investigate the degree of contamination and to remediate the problem. A similar letter was sent to Wisconsin Public Service directing it to take the same steps. Tomahawk School District hired an engineer to investigate and remediate the problem. To date Tomahawk School district has been sending bills for the cost of investigation of the problem and remediation of the problem to Wisconsin Public Service who has been paying said bills without admitting responsibility therefor.

Tomahawk School District has paid none of the costs of investigation or remediation to date associated with this incident and has filed no legal action as against Wisconsin Public Service. Tomahawk School District did not lose the use and occupancy of its building at all as the result of said contamination.

Wisconsin Public Service commenced a lawsuit as against Heritage Mutual Insurance Company based upon Heritage's insurance policy issued to Helmreich Utility Construction, Inc. at the time of the cutting of the underground fuel pipe. All amounts claimed by Wisconsin Public Service as

against Heritage Mutual Insurance Company are for payments made by it to or on behalf of the Tomahawk School District for the investigation of and the remediation of the contamination on Tomahawk School District Property. Wisconsin Public Service complied with Sec. 144.76 Wis. Stats. [Section 144.76, STATS., governs hazardous substance spills.]

The stipulated facts also included the contract between WPS and Helmreich (including the indemnification agreement), the insurance contract between Helmreich and Heritage, and the DNR letters to the school district and WPS. The indemnification agreement provides in relevant part:

> To the fullest extent permitted by law, the Contractor [Helmreich] shall fully indemnify and completely hold harmless the Company [WPS], its agents, insurers and/or employees from and against all actions, claims, demands, damages, losses, costs and expenses, including but not limited to attorney's fees (and any other costs associated with the handling of or defense of any such action or claim of any kind), which relate to personal or bodily injury, sickness, disease, death, or injury or damage to property of any kind (including without limitation the loss of use thereof), and including without limitation any consequential damage arising therefrom, where all or any of such actions, claims, damages, losses, costs or expenses in any way arise out of or by reason of, or are claimed to arise out of or by reason of, in whole or in part, any act or omission of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable.

The letters from the DNR to the school district and WPS stated:

Under s. 144.76(3), Wis. Stats., any person who possesses or controls a hazardous substance which is discharged, or who causes the discharge of a hazardous substance, must take the actions necessary to restore the environment and minimize the harmful effects from the discharge to the air, lands or waters of the State.

The DNR stated that because WPS was instrumental in the release of a hazardous substance, and because the school district was the legal owner of the property, both WPS and the school district were responsible for investigating and cleaning up the property.

The parties agree there are two issues on appeal: (1) whether there is coverage under the Heritage insurance policy for the costs WPS incurred paying the bills for investigation and remediation of the school district's property; and (2) whether the policy's pollution exclusion applies.

Our review of summary judgment is de novo. *Park Bancorporation, Inc. v. Sletteland*, 182 Wis. 2d 131, 140, 513 N.W.2d 609, 613 (Ct. App. 1994). When reviewing summary judgment, we apply the standard set forth in § 802.08(2), STATS., in the same manner as the circuit court. *Kreinz v. NDII Secs. Corp.*, 138 Wis. 2d 204, 209, 406 N.W.2d 164, 166 (Ct. App. 1987). This appeal, based on stipulated facts, concerns a question of law and is therefore suitable for summary judgment resolution.

The interpretation of an insurance policy is a question of law this court decides independently of the circuit court. *Smith v. Atlantic Mut. Ins. Co.*, 155 Wis. 2d 808, 810, 456 N.W.2d 597, 598 (1990). Insurance

policies are controlled by the same principles of law applicable to other contracts. *Id*.

## WHETHER THE POLICY PROVIDES COVERAGE

First, we consider whether the Heritage policy provides coverage for the money WPS is seeking pursuant to its indemnification agreement with Helmreich.[2] WPS maintains that the following policy language provides coverage for Helmreich:

> 1. Insuring Agreement.
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. (Emphasis in original.)

At issue is whether the money WPS is seeking is included in the term "damages." The policy does not define "damages."

Heritage argues that WPS seeks "response costs," not "damages." Our supreme court in *City of Edgerton v. General Cas. Co.*, 184 Wis. 2d 750, 517 N.W.2d 463 (1994), stated that Superfund response costs do not constitute damages under the terms of a comprehensive general liability insurance policy. *Id*. at 782, 517

---

[2] WPS's complaint alleged first that pursuant to its indemnification agreement with Helmreich, it was entitled to indemnification for the costs it incurred paying the investigation and remediation bills for the school district. A second cause of action, for contribution, was plead in the alternative, anticipating that the court could determine the indemnification provisions of WPS's contract with Helmreich were unenforceable. Because we conclude there is coverage based on the claim for indemnification, we do not review the claim for contribution.

N.W.2d at 477. Therefore, Heritage argues, the policy does not provide coverage for the expenses WPS incurred paying the bills for investigating and remediating the damage caused by the fuel oil leak. We do not agree with Heritage that *Edgerton*'s holding relieves insurers of liability for all sums for which insureds are liable for negligently damaging others' property.

Our conclusion is based in part on *Nischke v. Farmers & Merchants Bank & Trust*, 187 Wis. 2d 96, 522 N.W.2d 542 (Ct. App. 1994), a case this court decided after *Edgerton*. In *Nischke*, we recognized that where a landowner's action was based in negligence, the landowner could recover from a tortfeasor the costs to remediate a site in response to letters from the DNR. *Id.* at 103-04, 522 N.W.2d at 545. Additionally, we held that because the landowner had a legal duty to restore the property, she could recover the cost of repair from the tortfeasor even though such costs exceed the diminishment in her property's value. *Id.* at 118, 522 N.W.2d at 551. The landowner in *Nischke* received legal compensation from the tortfeasor for past wrongs, or legal damages, which, according to *Edgerton* are what the term "damages" as used in insurance policies unambiguously means. *See Edgerton*, 184 Wis. 2d at 784, 517 N.W.2d at 478.

In *Nischke*, we did not address whether the tortfeasor's insurer would be required to indemnify the tortfeasor; the issue presented was whether the landowner could recover from the tortfeasor. *Id.* at 103-05, 522 N.W.2d at 545-46. However, *Nischke* is instructive because it stands for the proposition that when a landowner spends money in response to a government directive to remediate, the money can be recovered as legal damages from the tortfeasor.

Applying *Nischke* to the instant case, we observe that WPS is seeking to recover from its subcontractor, Helmreich, who negligently damaged the fuel oil pipe, causing contamination to the school's property. The sums WPS seeks are those it spent paying the remediation bills on behalf of the school, at the school's request, because WPS recognized it was legally liable for the negligent acts of its subcontractor. The term "damages" is defined as "legal compensation for past wrongs or injuries and is generally pecuniary in nature." *Edgerton*, 184 Wis. 2d at 783, 517 N.W.2d at 478. Here, WPS seeks reimbursement pursuant to its indemnification contract with Helmreich for expenses incurred remedying past wrongs: property damage caused by Helmreich. Because legal damages are those which CGL policies unambiguously mean when they use the word "damages," we conclude WPS is seeking "damages" as that term is used in Heritage's policy, even if the legal damages WPS seeks represent bills paid on behalf of the school district for work performed in response to a DNR letter.

Our conclusion is consistent with the intent of CGL policies: to provide liability coverage for insureds against third-party claims for damages that are based on an insured's alleged negligence. *See Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1033 (Md. 1993) ("A hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an 'all-risks' policy also covering losses sustained by the policy-holder."). Helmreich negligently caused property damage for which WPS, as the contractor, is ultimately liable. WPS has recognized its liability by paying the school district's costs to repair the land. Helmreich

agreed to indemnify WPS for Helmreich's negligence. Heritage in its insurance policy with Helmreich contracted to pay for the damages that result from Helmreich's negligent actions. We conclude that Heritage should not be able to avoid its obligation to pay the costs incurred to restore the property damaged by Helmreich's negligence simply because the repairs were directed by the government.

Heritage argues that under *Edgerton*, cleanup costs incurred under ch. 144, STATS., whether past or future costs, are an equitable remedy and do not constitute "damages" under Heritage's policy. However, Heritage ignores the significant differences between this case and *Edgerton*. In *Edgerton*, the insureds sought coverage under their CGL policies for contamination to property they owned or occupied that was caused by their own actions. The insureds in *Edgerton* argued the letters the DNR and Environmental Protection Agency sent them constituted a suit, and that the money they were forced to spend on remediation of property they owned or occupied constituted damages under their policies. Our supreme court rejected their argument, holding that the DNR's directive that the city and ES & G clean up the property did not constitute a suit for damages. *Id.* at 786, 517 N.W.2d at 479.

In contrast, the instant case presents a situation where a contractor seeks reimbursement for bills it paid on behalf of a property owner, at the property owner's request, because the property owner suffered property damage due to a subcontractor's negligence. WPS seeks reimbursement, pursuant to its indemnification contract with Helmreich, for expenses incurred remedying past wrongs or injuries, which the term "damages" as used in CGL policies unambiguously means. *See id.* at 784, 517 N.W.2d at 478. Yet, the legal

damages WPS seeks are the same dollars it used to pay bills on behalf of the school district after both the school district and WPS received a government directive to remediate the contaminated site. Therein lies the heart of the issue presented: does *Edgerton* preclude an insurer's obligation to defend and indemnify its insured, the tortfeasor, in those cases where the government has ordered the landowner to clean up the negligently-damaged property?

We conclude *Edgerton*'s holding is not as broad as Heritage maintains and that its facts can be distinguished from this case. In *Edgerton*, the insureds sought liability coverage for costs they incurred to remediate contamination on land they owned or occupied that resulted from their own actions. In *Edgerton*, the court did not state, or in our view even suggest, that when a landowner is required to repair its land because of another's negligent act, the tortfeasor's insurer is relieved of its obligation under the insurance policy to compensate the landowner for its costs because the landowner responded to a government directive. *See Nischke*. To the contrary, we conclude that if one negligently damages another's land, the landowner is entitled to recover from the tortfeasor's insurer those costs incurred to repair the property, regardless of whether the government directed the cleanup.

In sum, we conclude that under Heritage's liability policy, Heritage must defend and indemnify Helmreich for the damages Helmreich caused and for which Helmreich is liable under the indemnification agreement with WPS. Because we conclude there is insurance coverage for WPS's cause of action for indemnification, we do not address WPS's second cause of action, contribution.

Our inquiry does not end at this point because, even if the insurance agreement provides coverage, Heritage may not be required to defend and indemnify Helmreich if the pollution exclusion applies.

## WHETHER THE POLLUTION EXCLUSION APPLIES

Heritage argues that even if cleanup costs are "damages" under the insurance policy, the cost of such cleanup is excluded from coverage under the following exclusion:

> This insurance does not apply to:
>
> . . . .
> (2) Any loss, cost or expense arising out of any governmental direction or request that you test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize pollutants.

Heritage recognizes that under a literal reading of this exclusion, the exclusion does not apply because there was no government direction or request that Helmreich, the "you" in the exclusion, take action; the DNR never sent Helmreich a potentially responsible person (PRP) letter. However, Heritage argues:

> [C]overage should not be postured upon who received the request but rather upon who is being asked to pay for compliance. To require [Heritage] to pay these costs simply because the request was not directed to Helmreich (a liable party) in the first instance, would, as the trial court noted, be putting form over substance.

Interpretation of an insurance contract is controlled by general principles of contract construction.

*Sprangers v. Greatway Ins. Co.,* 182 Wis. 2d 521, 536, 514 N.W.2d 1, 6 (1994). The objective is to ascertain and carry out the intention of the parties. *Id.* The language of an insurance policy should be interpreted to mean what a reasonable person in the position of the insured would have understood the words to mean. *Id.* A provision in an insurance policy is ambiguous if, when read in context, it is reasonably or fairly susceptible to more than one construction. *Id.* at 536-37, 514 N.W.2d at 6. Conversely, when the terms of an insurance policy are plain on their face, the policy must not be rewritten by construction. *See Limpert v. Smith,* 56 Wis. 2d 632, 640, 203 N.W.2d 29, 33 (1973).

Our examination of the policy exclusion leads us to one inescapable conclusion: The exclusion does not apply because Helmreich never received a directive from the government to clean up the property. There is no ambiguity; thus, we cannot rewrite the policy by construing the word "you" to include anyone but the insured, Helmreich. *See id.*

We also conclude the exclusion is inapplicable for an additional reason. The policy excludes coverage for "Any loss, cost or expense arising out of any governmental direction or request." The basis for Helmreich's liability in this case is not its liability as a PRP under CERCLA or state law. Instead, WPS's complaint alleges Helmreich is liable under its indemnification agreement with WPS because Helmreich negligently broke a pipe that resulted in property damage for which WPS, as the contractor, is ultimately liable. WPS is seeking indemnification for the costs it incurred because it recognized its liability to the school for the negligent act of its subcontractor. Therefore, WPS's claim against Helmreich is not "arising out of

any governmental direction," but, rather, arises out of the indemnification agreement under which Helmreich agreed to assume liability for its negligent acts. Thus, the pollution exclusion is inapplicable on this basis.

In conclusion, because WPS's complaint seeks money damages under the indemnification contract for Helmreich's negligent actions, we conclude Heritage, pursuant to its insurance policy, has a duty to defend and indemnify Helmreich. Therefore, we reverse the summary judgment dismissing WPS's complaint and remand the case for further proceedings.

*By the Court.*—Judgment reversed and cause remanded.