AMCAST INDUSTRIAL CORPORATION, Plaintiff-Appellant,†

v.

AFFILIATED FM INSURANCE COMPANY, Defendant,

CONTINENTAL CASUALTY COMPANY , Employers
Insurance of Wausau, Nationwide Mutual Insurance
Company, Employers Reinsurance Corporation,
Pacific Employers Insurance Company, First State
Insurance Company, Hartford Accident and Indem-
nity Company, Highlands Insurance Company,
International Insurance Company, United States Fire
Insurance Company and National Union Fire
Insurance Company of Pittsburgh, PA, Defendants-
Respondents,

UNITED STATES FIDELITY AND GUARANTY COMPANY,
Defendant.

Court of Appeals

*No. 96–2968. Submitted on briefs May 20, 1998.—Decided
July 29, 1998.*

(Also reported in 584 N.W.2d 218.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Ann Wightman, D. Jeffrey Ireland* and *Thomas R. Kraemer* of *Faruki, Gilliam & Ireland, P.L.L.* of Dayton, Ohio; and *Kim Grimmer* and *Jeanette Lytle* of *Solheim, Billing & Grimmer, S.C.,* of Madison.

On behalf of the defendant-respondent Continental Casualty Company, the cause was submitted on the brief of *Stephen Sonderby* and *Peter G. Bora* of *Haskell & Perrin* of Chicago, Illinois; and *Raymond J. Pollen* of *Crivello, Carlson, Mentkowski & Steeves* of Milwaukee.

On behalf of defendants-respondents Employers Insurance of Wausau and Nationwide Mutual Insurance Company, the cause was submitted on the briefs of *Michelle K. Enright* and *Daniel S. Weiss* of *Zelle & Larson, LLP* of Minneapolis, Minnesota; and *Timothy J. Strattner* of *Schellinger & Doyle, S.C.,* of Brookfield.

On behalf of defendant-respondent Employers Reinsurance Corporation, the cause was submitted on the brief of *Craig W. Nelson* of *Nelson, Dries & Zimmerman, S.C.,* of Brookfield; and *Kimball Ann Lane* and *Frances Phillips* of *Luce, Forward, Hamilton & Scripps* of New York, New York.

On behalf of the defendant-respondent Pacific Employers Insurance Company, the cause was submitted on the brief of *Craig W. Nelson* of *Nelson, Dries & Zimmerman, S.C.,* of Brookfield; and *Elizabeth T. Jozefowicz* of *Cohn & Russell* of Chicago, Illinois.

On behalf of defendants-respondents First State Insurance Company and Hartford Accident and Indemnity Company, the cause was submitted on the joinder brief of *Paul J. Pytlik* of *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.,* of Milwaukee; and *Louis G. Adolfsen* and *Susan M. Chesler* of *Melito & Adolfsen, P.C.,* of New York, New York.

On behalf of defendant-respondent Highlands Insurance Company, the cause was submitted on the brief of *Paul W. Schwarzenbart* of *Lee, Kilkelly, Paulson & Kabaker, S.C.,* of Madison.

On behalf of the defendants-respondents International Insurance Company and United States Fire Insurance Company, the cause was submitted on the brief of *James M. Fredericks* of *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee.

On behalf of defendant-respondent National Union Fire Insurance Company of Pittsburgh, PA, the cause was submitted on the brief of *Margaret J. Orbon, Brenda D. McNamara* and *Edward M. Kay* of *Clausen Miller, P.C.,* of Chicago, Illinois; and *Thomas A. Piette* of *Piette & Jacobson* of Milwaukee.

On behalf of the Wisconsin Policyholders Association, there was an amicus curiae brief by *Mary K. Braza, Michael D. Flanagan* and *Lisa S. Neubauer* of *Foley & Lardner* of Milwaukee.

On behalf of the Wisconsin Insurance Alliance and Insurance Environmental Litigation Association, there was an amicus curiae brief by *Robert C. Burrell* and *R. Jeffrey Wagner* of *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee; and of counsel *Laura A. Foggan, Marilyn E. Kerst* and *Mary E. Borja* of *Wiley, Rein & Fielding* of Washington, D.C.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

SNYDER, P.J. Amcast Industrial Corporation appeals from the trial court's grant of summary judgment to numerous insurance companies that provided comprehensive general liability insurance and/or

excess or "umbrella" coverage to Amcast.[1] The trial court determined that *City of Edgerton v. General Casualty Co.*, 184 Wis. 2d 750, 517 N.W.2d 463 (1994), controlled and negated the coverage sought by Amcast. Amcast appeals this decision and makes the following claims:[2] (1) that it has incurred "damages" for which it is entitled to coverage because the harm was to property "not owned or occupied by Amcast"; (2) that it is entitled to a defense under certain policies because under the policy language the insurers promised to defend not only "suits," but also "claims"; (3) that it raised a genuine issue of material fact regarding the parties' intent in entering into the comprehensive general liability (CGL) policies and this precluded summary judgment; and (4) that it is entitled to appeal the trial court's decision regarding the "C list" policies. *See infra* note 7.

While Amcast attempts to differentiate among its various policies on the basis of contractual language and provisions, we agree with the trial court that in spite of the fact that varied language is employed by different insurers, *Edgerton* controls. The dispositive factor in this case is that Amcast is seeking coverage for costs associated with a Wisconsin DNR consent order requiring it to "investigate and remediate . . . contamination in the sediments, water and soil . . .

---

[1] Amcast reached a settlement with Affiliated FM Insurance Company, and Amcast's claims were dismissed with prejudice by the trial court. United States Fidelity and Guaranty Company was voluntarily dismissed by order of this court dated April 22, 1998.

[2] Within each of the first three issues Amcast makes numerous arguments in support of its overall coverage claim. We will address these supporting arguments as necessary in the discussion portion of the opinion.

which emanated from the Amcast facility" and coverage for remediation costs after its identification as a "potentially responsible party" for contamination at a landfill.[3] Under *Edgerton*, these costs are not "damages." Therefore, because Amcast is seeking coverage for costs that do not fall within the reach of a CGL policy, we conclude, as did the trial court, that Amcast's attempt to focus on the separate provisions of individual policies is of no avail. We affirm the trial court's grant of summary judgment to the defendant insurance companies.[4]

## FACTS

Amcast owned and operated an aluminum die casting facility in the city of Cedarburg, Wisconsin. Beginning in 1966, Amcast used a cutting fluid containing polychlorinated biphenals (PCBs) in its operations at this facility. In the mid–1980's, the DNR discovered elevated levels of PCBs in fish taken from a creek near the Cedarburg facility. In 1990, sediment samples collected from a quarry pond near the Amcast facility also revealed elevated levels of PCBs. The DNR ultimately concluded that Amcast was a responsible party under § 144.76, STATS., 1993–94,[5] and subsequently issued a consent order requiring Amcast to fully investigate and remediate the PCB contamina-

---

[3] This was based on Amcast's status as a generator or transporter of waste products that were disposed of at the landfill.

[4] In addition to the briefs provided by the parties, this court also received *amicus curiae* briefs from The Wisconsin Policyholders Association and the Wisconsin Insurance Alliance and the Insurance Environmental Litigation Association.

[5] This statutory section was amended and redesignated by 1995 Wis. Act 227, §§ 699–711 and 1995 Wis. Act 27, §§ 4326–4330m.

tion in the sediment, water and soil in and around the creek.[6]

The Environmental Protection Agency (EPA) and the DNR also discovered contaminated groundwater in another area of Cedarburg which the agencies concluded was associated with a landfill. In 1993, the DNR notified Amcast that it was considered to be a potentially responsible party (PRP) based on its status as a "generator or transporter of liquid/oily wastes disposed of at the Landfill." Amcast was invited to a meeting "to discuss work which has occurred at the site to date" and to participate in a "Superfund Contract for a Remedial Investigation/Feasibility Study and Operable Unit/Interim Action Remedy for the site."

Amcast alleged in its complaint that the defendant insurers are obligated to defend it against the PRP letter and notification by the DNR, as well as to indemnify Amcast for costs associated with its response to the contamination at both sites. Amcast claimed that it "bargained for comprehensive insurance coverage from its insurance carriers" and that the defendant insurance companies "promised to provide insurance coverage and, in some cases, a defense to Amcast for periods relevant to this case." Nonetheless, the trial court concluded that under the holding of *Edgerton*, response costs are not "damages" as provided for in the policies, and summary judgment should be granted to all of the defendant insurance companies.

Amcast disagrees and claims that the trial court erred when it held that Amcast is not entitled to insurance coverage. Amcast argues that "[t]his Court should vacate the trial court's erroneous and conclusory hold-

---

[6] While the record contains evidence of some negotiations between the DNR and Amcast, it is not apparent whether actual remediation of the sites has commenced or is still pending.

ing and remand this case to the trial court for
development of the factual record, consideration of the
specific language of each of Amcast's insurance poli-
cies, and further proceedings consistent with
Wisconsin law." It is on this basis that Amcast
appeals.[7]

## STANDARD OF REVIEW

When reviewing a grant of summary judgment,
this court applies the standards of § 802.08, STATS., in
the same way the trial court applied them. *See General
Cas. Co. v. Hills,* 209 Wis. 2d 167, 175, 561 N.W.2d 718,
722 (1997). This court also determines the interpreta-
tion of an insurance policy as a matter of law, paying no

---

[7] In the trial court, Amcast brought a motion to place into
three groups the numerous policies that were in force during
various points of time pertinent to this action. These groupings
were based on the type of policy (whether a CGL policy or an
excess or "umbrella" policy) and the policy language.

The "C list" policies were all CGL policies that required the
insurer to defend Amcast in the event of a "suit seeking dam-
ages." These policies contained language that Amcast conceded
was "essentially identical to the language that was construed in
the *Edgerton* decision."

The "B list" included all of the remaining CGL policies with
more varied language. These policies provided coverage for
either "claims" or "suits" and offered to pay for "damages,"
"expenses" and "ultimate net loss." "Ultimate net loss" was con-
sidered to be sums paid *as damages* in settlement of a claim or
in satisfaction of a judgment.

The "A list" policies were excess or umbrella policies which
provided coverage "in excess of the underlying insurance."

The trial court granted Amcast's motion to group the poli-
cies in this way. We will use these same groupings for purposes
of our discussion.

deference to the lower court. *See id.* The court must examine the pleadings to determine whether a claim has been stated and whether there are any material issues in dispute. *See Park Bancorporation, Inc. v. Sletteland,* 182 Wis. 2d 131, 140, 513 N.W.2d 609, 613 (Ct. App. 1994). The party moving for summary judgment bears the burden of establishing the absence of a factual dispute and entitlement to judgment as a matter of law. *See id.* at 141, 513 N.W.2d at 613.

## DISCUSSION

Amcast contends that "[it] ha[s] incurred, and will continue to incur, damages for which it is entitled to coverage under each of the CGL policies at issue." It bases this position on its argument that "[t]he trial court erred in determining that costs associated with repairing harm allegedly caused by Amcast to property not owned or occupied by Amcast never constitutes damages and, therefore, Amcast is not entitled to coverage under any of its CGL policies." Amcast does not dispute that the *Edgerton* court held that costs of remediation are not "damages" within the meaning of CGL policy language. *See Edgerton,* 184 Wis. 2d at 782, 517 N.W.2d at 477. However, Amcast contends that in a later case the supreme court held that when a third party sought "damages" *for the cost of remediation efforts on land not owned by the insured,* the CGL policy at issue provided coverage. *See Hills,* 209 Wis. 2d at 184–85, 561 N.W.2d at 726. Amcast seeks to have this court apply the *Hills* rationale to its case, reverse the order for summary judgment and remand for a trial on the issue of which insurers are liable for the costs of remediation.

## The Edgerton Case

Because a determination as to which case controls is dispositive of many of the claims raised by Amcast, we begin with a brief discussion of the facts and the holdings of the two precedential cases. In *Edgerton,* the supreme court was presented with the following questions which are pertinent to the instant case: (1) whether the receipt of letters from a governmental agency requesting voluntary participation in an effort to clean up environmental contamination constituted a "suit seeking damages" and thereby triggered an insurance company's duty to defend, and (2) whether cleanup and remediation costs constitute "damages" within the context of a CGL insurance policy.

■ The *Edgerton* court concluded that letter notification that one may be a potentially responsible party and liable for hazardous waste remediation costs does not trigger an insurer's duty to defend because such letters do not constitute a "suit seeking damages" within the plain meaning of the policies in question. *See Edgerton,* 184 Wis. 2d at 758, 517 N.W.2d at 468. The court ultimately concluded that implicit in the operative definition of a "suit" was the requirement "that parties to an action are involved in actual court proceedings, initiated by the filing of a complaint." *Id.* at 775, 517 N.W.2d at 474. The court determined that even if the tone of a notification letter is somewhat confrontational, such a letter does not by itself impose legal liability. *See id.* at 777, 517 N.W.2d at 475. Because the options presented by such a letter do not rise to the level of a court proceeding, to construe such a piece of correspondence as a suit seeking damages "would create a duty for the insurer for which it had not contracted." *Id.* at 779, 517 N.W.2d at 476. Therefore,

the *Edgerton* court concluded that letters from the EPA or the DNR do not have the effect of initiating a lawsuit. *See id.* at 782, 517 N.W.2d at 477.

The second issue considered by the *Edgerton* court was whether response costs qualified as "damages" under the standard language of a CGL policy. *See id.* The court construed the standard CGL policy language as requiring the insurer to "defend suits against the insured requesting recovery for sums that the insured may become legally obligated to pay as damages." *Id.* (emphasis omitted). The court concluded that Superfund response costs are by definition "equitable relief" and are costs assessed to deter future contamination, not to compensate for past wrongs. *See id.* at 784–85, 517 N.W.2d at 478. Thus, response costs are not monetary compensation to make up for a claimed loss. Based on this, the *Edgerton* court unequivocally stated that "CERCLA Superfund response costs do not constitute damages."[8] *Id.* at 782, 517 N.W.2d at 477 (CERCLA, or the Comprehensive Environmental, Response, Compensation and Liability Act, empowered the federal government to identify hazardous waste sites and pursue remedial activities).

### The Hills Case

Following the *Edgerton* decision, the supreme court considered the *Hills* case. In that case Arrowhead Refining Company, a transporter of waste that was generated in part by Hills' service station, was notified by the EPA that its waste oil recycling business had

[8] In its discussion, the court included both federally mandated response costs and those pursuant to related state statutes. *See City of Edgerton v. General Cas. Co.*, 184 Wis. 2d 750, 784–86, 517 N.W.2d 463, 478–79 (1994).

been placed on a "National Priorities List." *See Hills,* 209 Wis. 2d at 171–72, 561 N.W.2d at 720. An investigation had revealed that Arrowhead's recycling activities had contaminated the site.

Five years later the federal government filed suit against Arrowhead and fourteen other defendants seeking, inter alia, to recover response costs for the environmental cleanup. *See id.* at 172, 561 N.W.2d at 721. As a result of that lawsuit, Arrowhead and twelve codefendants filed a third-party complaint against Hills and hundreds of other parties, seeking to recover the response costs associated with the cleanup. *See id.* The third-party complaint alleged a right of recovery based on both federal and state environmental liability acts, common law contribution and unjust enrichment. *See id.*

Hills' CGL insurer filed a declaratory judgment action, claiming that it had no duty to defend or indemnify Hills. *See id.* at 173, 561 N.W.2d at 721. Hills counterclaimed, arguing that the insurer had breached its contractual duties to defend and indemnify him and had acted in bad faith. *See id.* at 173–74, 561 N.W.2d at 721. Based on *Edgerton,* the trial court granted summary judgment to the insurer. *See id.* at 174, 561 N.W.2d at 721.

The court of appeals reversed, *see General Casualty Co. v. Hills,* 201 Wis. 2d 1, 548 N.W.2d 100 (Ct. App. 1996), and upon further review, the supreme court affirmed the court of appeals. The supreme court noted that the *Edgerton* decision demonstrated that any consideration of whether an action seeks damages must "consider the nature of the relief being sought—whether it is remedial, substitutionary relief that is intended to compensate for past wrongs, or preventive and focusing on future conduct." *Hills,* 209 Wis.

2d at 180, 561 N.W.2d at 724. The court then went on to outline three pertinent differences between the facts of the *Edgerton* and the *Hills* cases. The court noted that unlike in *Edgerton*, neither the EPA nor the DNR directed Hills, the insured, to incur remediation and response costs. *See Hills*, 209 Wis. 2d at 180, 561 N.W.2d at 724. Second, the contaminated property did not fit within the owned-property exclusion contained in Hills' policy. *See id.* Finally, Hills was not being sued to comply with an injunction; rather, he was targeted by a third party (Arrowhead) which sought "substitutionary, monetary relief to compensate for . . . losses they may incur." *Id.* at 181, 561 N.W.2d at 724. The *Hills* court concluded that the third party was seeking damages and Hills' CGL insurer was not relieved of its duty to defend.

## *Application of Case Law*

With the precedent of these two decisions as a framework, we consider the facts of the instant case. Amcast was notified by letter that it is a potentially responsible party in two separate instances of environmental contamination. This is factually similar to *Edgerton*. The state and federal governments are seeking to collect response and remediation costs directly from Amcast for the contamination; response costs were also sought in *Edgerton*. The DNR and EPA have identified Amcast as directly responsible for the contamination. According to the *Edgerton* court, under these circumstances Amcast's response costs are not "damages" as provided for in a CGL policy of insurance. On all of these points the instant case aligns with the facts of the *Edgerton* case.

Comparing the facts of the instant case to those in *Hills*, there are marked differences. In *Hills*, the

insured sought coverage for legal damages after he was sued by a third party. There is no third party in this action; there is no lawsuit. The only factor of the instant case which is facially similar to the *Hills* case is that the contaminated property is not owned by Amcast and thus does not fall within the owned-property exclusion. However, although the *Hills* court offered this fact as one which distinguished the *Hills* case from *Edgerton*, the *Hills* court also noted that the *Edgerton* decision had not reached the issue of the owned-property exclusion. *See Hills,* 209 Wis. 2d at 180 n.14, 561 N.W.2d at 724. In fact, the *Edgerton* court did not have to consider the impact of the owned-property exclusion because its holding was that, as a matter of law, a CGL policy does not include coverage for environmental remediation costs that are assessed to an insured through direct state or federal action.

The fact that the *Hills* court used the ownership of the property as distinguishing it from the facts of *Edgerton* does not make it a singularly dispositive factor. While the owned-property exclusion *could have been* a narrower basis for the *Edgerton* court's conclusion that the CGL policy did not provide coverage for response costs, the court did not address that. *See Hills,* 209 Wis. 2d at 180 n.14, 561 N.W.2d at 724. Instead, *Edgerton* stands for the proposition that response costs incurred by an insured are not damages; therefore, an insured cannot expect coverage under a policy that agrees to cover an insured's damages. In *Hills,* however, the court narrowed this broad exclusion. There the court determined that if an action is filed by a third party seeking to offset its remediation costs, such an action could potentially result in a judgment requiring an insured to pay *compensatory damages*:

*Shorewood* and *Edgerton* demonstrate that in order to determine whether an action seeks "damages," we must consider the nature of the relief being sought—whether it is remedial, substitutionary relief that is intended to compensate for past wrongs, or preventive and focusing on future conduct. . . .

In this case, Arrowhead does not want Hills to take, or refrain from taking, any action. Instead, Arrowhead seeks substitutionary, monetary relief to compensate for the losses they may incur. The remedy that Arrowhead seeks is intended to compensate for past wrongs, not to prevent future harm. Thus, under the definition set forth and applied in *Shorewood* and *Edgerton*, Arrowhead is seeking "damages" from Hills as that word is used in the insurance policies at issue. Accordingly, *Edgerton* does not relieve General Casualty of its duty to defend Hills.

*Hills*, 209 Wis. 2d at 180–81, 561 N.W.2d at 724. We do not read *Hills* as basing its ultimate holding on the ownership of the property in question. While the court noted that the contaminated property did not fit within the owned-property exclusion, it found dispositive *the type of relief sought and the posture of the party seeking relief. See id.* at 182, 561 N.W.2d at 725 ("[T]he fundamental remedy Arrowhead seeks from Hills is compensatory damages for the past injuries he allegedly inflicted on the Arrowhead site.").[9]

---

[9] Amcast argues that in *Wisconsin Public Service Corp. v. Heritage Mutual Insurance Co.*, 209 Wis. 2d 160, 561 N.W.2d 726 (1997), "[t]he Supreme Court held that an action for cleanup costs seeks 'damages' under the [CGL] policy where 'such property was not owned, rented or occupied by [the insured].' " However, this excerpt misconstrues the court's holding. The actual text from *Wisconsin Public Service* is as follows:

We conclude that on its facts, the instant case is controlled by the reasoning of the *Edgerton* decision. The single *Hills* factor concerning the ownership of the property is not dispositive.[10] On all of its other facts, the posture of the instant case is directly on point with the *Edgerton* decision. The fundamental difference between the *Edgerton* and the *Hills* cases is the fact that in *Hills* there is a third party making a claim.[11]

In *General Cas. Co. v. Hills,* 209 Wis. 2d 167, 561 N.W.2d 718 (1997), this court held that *where parties other than the EPA or DNR seek recovery from an insurer* for damages its insured allegedly inflicted through contamination on property that does not fit within an owned-property exclusion, the suit seeks "damages" under an insurance policy.

*Wisconsin Pub. Serv. Corp.,* 209 Wis. 2d at 165, 561 N.W.2d at 728–29 (emphasis added). Implicit in this statement is the necessity of a third-party action.

[10] Amcast argues in passing that it is entitled to coverage because "[t]he government is the owner of ground and surface water in Wisconsin." Therefore, Amcast reasons, it is seeking coverage for cleanup costs sought by a *property owner*, which is similar to the *Hills* case. However, this argument is without merit because the DNR brought this action in its official capacity pursuant to § 144.76, STATS., 1993–94, and not as a property owner. Additionally, there is no third party and no third-party claim. *See infra* note 11.

[11] There are other Wisconsin cases which employ the same reasoning: *Spic & Span, Inc. v. Continental Cas. Co.,* 203 Wis. 2d 118, 552 N.W.2d 435 (Ct. App. 1996) (environmental remediation costs are legal damages which are recoverable from third parties); *Sauk County v. Employers Ins. of Wausau,* 202 Wis. 2d 433, 550 N.W.2d 439 (Ct. App. 1996) (insurer has duty to defend its insured against counterclaims by third parties sued by the insured in its efforts to recover response costs); *Wisconsin Pub. Serv. Corp. v. Heritage Mut. Ins. Co.,* 200 Wis. 2d 821, 548 N.W.2d 544 (Ct. App. 1996), *aff'd,* 209 Wis. 2d 160, 561 N.W.2d 726 (1997) (PSC can seek recovery from a third

The law of *Edgerton* therefore controls and we affirm the trial court.

Notwithstanding the above, Amcast argues that because some of its policies include provisions requiring the policy to cover "losses," and not only "damages," the trial court erred when it ignored the express provisions of these individual policies. However, the policies at issue which did not include the term "damages" are excess or umbrella insurance coverage *that is not triggered until coverage under the primary policy is undertaken.* Because all of the primary insurance policies contain the "as damages" qualifier, which negates coverage in this instance, the express language of the excess and umbrella policies is immaterial.[12]

■

Amcast also argues that certain of its policies contain language by which the insurer promised to defend not only "suits," but also "claims." Therefore, Amcast reasons, these policies do not fall within the rationale of *Edgerton.* We are not persuaded. In each of the poli-

---

party's insurer for cleanup costs incurred due to the negligence of third-party contractor); *Production Stamping Corp. v. Maryland Cas. Co.,* 199 Wis. 2d 322, 544 N.W.2d 584 (Ct. App. 1996) (insurer has duty to defend against a federal suit brought by third party (adjoining property owner) alleging environmental contamination due to Production Stamping's disposal practices).

[12] Each of the excess policies contains coverage language which includes a provision similar to the following:

> The company will pay on behalf of the insured <u>ultimate net loss</u> *in excess of the total applicable limit . . . of underlying insurance . . . .* [Emphasis added.]

Therefore, until the coverage is triggered by the provisions of the primary policy, the excess insurance does not come into play.

cies that obligate the insurer to defend Amcast against "claims," that term is modified by the word "damages."[13] Because the duty to defend is predicated on "allegations *in a complaint* which, if proved, *would give rise to recovery under the terms and conditions of the insurance policy*," *Edgerton,* 184 Wis. 2d at 765, 517 N.W.2d at 470 (second emphasis added; quoted source omitted), the use of the term "claim" rather than "suit"

---

[13] Amcast identifies the following specific policies as obligating the insurer to defend Amcast against any "claims." We include language from the actual policy provisions:

(1) Hartford Accident and Indemnity Company policies nos. 33 HU 10293 and 33 HU 380010 require Hartford to pay "all sums which the *insured* shall become legally obligated to pay *as damages.*" [Emphasis added.]

(2) First State Insurance Company policy no. 909106 requires that the insurer cover Amcast for "ULTIMATE NET LOSS ... which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law ... *for damages* or expenses." [Emphasis added.]

(3) United States Fire Insurance Company policy no. 520 018576 2 requires the company to provide a defense for "the ultimate net loss ... which the insured may sustain *by reason of liability imposed upon the insured by law ...*

 (a) Personal Injury Liability, which means liability *for damages* ...

 (b) Property Damage Liability, which means liability *for damages.*" [Emphasis added.]

(4) International Insurance Company policy no. 523 450023 3 requires the company to pay the "ULTIMATE NET LOSS" which is defined as "all sums which the insured is legally obligated to pay *as damages*"; policy no. 523 479621 6 states that the insurer will pay "those sums that the 'insured' becomes legally obligated to pay *as damages.*" [Emphasis added.]

(5) National Union Fire Insurance Company of Pittsburgh, PA policy no. 1189638 incorporates the terms of First State policy no. 909106, which is outlined in (2) above.

is immaterial. There is no indemnification under any of the policies for Amcast's remediation costs as a matter of law, and this argument must fail. *See Regent Ins. Co. v. City of Manitowoc,* 205 Wis. 2d 450, 458–59, 556 N.W.2d 405, 408 (Ct. App. 1996).

Amcast also contends that it presented sufficient evidence to create a genuine issue of material fact as to the parties' intent regarding the coverage provided by the CGL policies and that this precludes summary judgment. Amcast argues that when the Wisconsin Supreme Court decided *Edgerton,* the court "did not have before it key facts concerning CGL policies present in this case." Amcast then goes on to argue that because at least one insurer represented its CGL policy as affording "the most complete protection attainable against liability for bodily injury and damage to property, leaving no loopholes for possible uninsured lawsuits," the trial court should have denied the summary judgment motion and permitted inquiry into the intent of the parties in entering into the CGL policies at issue.

There are two problems with this argument. First, it is a well-known rule of contract construction that contracts must be construed as they are written. *See Hunzinger Constr. Co. v. Granite Resources Corp.,* 196 Wis. 2d 327, 339, 538 N.W.2d 804, 809 (Ct. App. 1995). Second, the contract language governs if it is unambiguous, even in the face of a different interpretation the parties themselves may have placed on the agreement. *See City of Franklin v. Crystal Ridge, Inc.,* 174 Wis. 2d 358, 362, 497 N.W.2d 747, 749–50 (Ct. App. 1993), *rev'd on other grounds,* 180 Wis. 2d 561, 509 N.W.2d 730 (1994); *Mattheis v. Heritage Mut. Ins. Co.,* 169 Wis. 2d 716, 722, 487 N.W.2d 52, 54 (Ct. App. 1992) (a term or

provision is not ambiguous merely because it is general enough to encompass more than one interpretation). The court in *Edgerton* unequivocally construed the term "damages" as not including environmental response and remediation costs under either state or federal action. There is no ambiguity in the contract language and Amcast's claim that a "latent ambiguity as to the parties' intent . . . precludes summary judgment" is without merit.

Amcast's final claim is that it should be released from a stipulation that it would not appeal the trial court's decision with regard to the "C list" policies. Because our decision affirms the trial court and holds that there is no coverage under any of the CGL policies issued to Amcast, this final issue is moot and will not be addressed.[14] *See City of Racine v. J-T Enters. of Am., Inc.,* 64 Wis. 2d 691, 700, 221 N.W.2d 869, 874 (1974).

*By the Court.*—Judgment affirmed.

■

---

[14] Because of our holding, two other issues raised by several of the respondent insurance companies also become moot. National Union raises a question as to the inclusion of its three "C list" policies in the trial court's grant of summary judgment after the trial court granted Amcast's motion to voluntarily dismiss those three policies from the action. National Union submits that its policies were included in this appeal due to a "clerical error." Additionally, a choice of law argument was raised by several insurers in which each claimed that Ohio law, not Wisconsin law, should be applied in construing the coverage afforded under certain policies. Because our decision holds that there is no coverage for Amcast under any of the policies, both of these issues are moot.